**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TFB MIDATLANTIC 4, LLC, et al.,** | : | **Civil No. 1:21-CV-299** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **THE LOCAL CAR WASH, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

This case, which involves mutual recriminations arising out of the sale of a car wash in Chambersburg, Pennsylvania, presents us with an interesting combination of characters and events. The plaintiffs, the purchasers of this car wash, are by their own admission sophisticated investors with prior, direct experience in the car wash industry who have made a study of the economics of this trade. In contrast, it is entirely undisputed that the defendant, the seller of this car wash, John Treanor, was a less sophisticated businessman whose understanding of the financial complexities of this business was significantly less certain than that of the plaintiffs. Indeed, Treanor has candidly admitted as much and the plaintiffs have agreed, noting that during their due diligence on this purchase they identified "a sales and use issue, which frankly, the seller didn't even understand."  (Doc. 88, at 230).

1

Despite this undisputed disparity in business acumen favoring the plaintiffs in this transaction, these plaintiffs are now suing Treanor alleging that he duped them and breached the terms of this sales contract, which required Treanor to provide accurate financial information to the purchasers as part of their due diligence inquiry. The gravamen of these breach of contract and fraud claims is the plaintiffs' assertion that Treanor misstated the profitability of this business when he allegedly advised them to rely upon gross sales figures in assessing the viability of this car wash, and failed to disclose that the actual net monthly sales for the business were significantly lower than these reported gross sales, which included redemption transactions in which customers who had pre-paid at some earlier date redeemed car wash certificates. This alleged discrepancy, which the plaintiffs claim was hidden from them, is the pillar upon which the plaintiffs have built their complaint.

However, upon consideration of the undisputed facts, as discussed in greater detail below, we find that this pillar, the lynchpin of the plaintiffs' complaint, fails because the fact allegedly hidden—the disparity between reported gross sales and actual monthly sales—was adequately disclosed in the financial information provided to the plaintiffs by Treanor. Thus, the fact that the plaintiffs claim was concealed was actually hiding in plain sight. Moreover, given the fact that this information was actually available to the plaintiffs, who were sophisticated investors in this market, the plaintiffs cannot assert that the reasonably relied upon any

representations regarding gross earning made by Treanor, a person who the plaintiffs admit "frankly . . . didn't even understand" many aspects of the business' financing.

Pending before the court is a motion for summary judgment filed by the defendants, John Treanor, The Local Car Wash, Inc., and Treanor Properties, LLC. (Doc. 77), and a motion for partial summary judgment filed by the plaintiffs, TFB Midatlantic 4, LLC and TFB Midatlantic 4 RE, LLC (collectively, "TFB") (Doc. 78). The plaintiffs filed this action against The Local Car Wash, Inc., Treanor Properties, and the owner of these entities, John Treanor, arising out of the purchase of a car wash in Chambersburg, Pennsylvania. (Doc. 1-1). The complaint asserts claims for breach of contract, fraud, and business conspiracy, and requests monetary damages, rescission of the contract, rescission of the promissory note, and for the Court to pierce the corporate veil and hold Mr. Treanor personally liable for the actions of his entities.

In their motion for partial summary judgment, the plaintiffs contend that they are entitled to judgment as a matter of law on Count I of the amended complaint, which alleges that the defendants breached the contract of sale for this car wash when they provided incorrect or inaccurate financial information related to the contract. For their part, the defendants contend that they are entitled to summary judgment on all of the plaintiffs' claims since the undisputed facts show that any disparity between gross earnings as reflected on tax returns and actual monthly receipts was

3

fully disclosed in the financial data provided to the plaintiffs during their extended due diligence inquiry. The defendants also assert a counterclaim against the plaintiffs, arguing that TFB breached the promissory note and the escrow agreement because it has not paid any money under the promissory note and has not released the funds in escrow to pay sales taxes.

After consideration, we conclude that the plaintiffs' breach of contract, business conspiracy, and fraud claims fail as a matter of law. Additionally, we find that summary judgement is appropriate as to the defendants' counterclaim. Accordingly, we will deny the plaintiffs' motion for partial summary judgment (Doc. 78), and we will grant the defendants' motion for summary judgment in its entirety. (Doc 77).

## II.   <u>Statement of Facts and of the Case</u>[1]

John Treanor was the owner and operator of The Local Car Wash, a car wash business located in Chambersburg, Pennsylvania. Mr. Treanor was a high school graduate and conceded that he "didn't really have a good understanding of running a car wash." (Doc. 88, at 100). In 2019, Michael Cueter and Bo Wang, the owners of the TFB entities, reached out to Treanor and inquired if he was interested in selling The Local Car Wash. Wang and Cueter were experienced businessmen who had

---

[1] The factual background of this Memorandum Opinion is taken from the parties' submissions to the extent they are consistent with the evidence in the record. (Docs. 78-80, 89-90, 95).

graduated from one of the country's top business schools. Both men possessed extensive and sophisticated business investment backgrounds. Mr. Cueter was employed as a financial analyst for various private investment firms, and Mr. Wang also had experience performing financial due diligence and reviewing financial documents. (Doc. 88, ¶¶ 22-24, 28-30). Moreover, by their own account, the plaintiffs were fully versed in the economics car wash business when they began negotiating this purchase. According to Mr. Cueter, he and Mr. Wang had done extensive research in 2019 into car wash businesses prior to reaching out to Mr. Treanor about buying The Local Car Wash. (Id., at 175).

In response to this inquiry, Treanor indicated that he was willing to sell, and further indicated that he would not consider selling for less than 1.2 million dollars. Cueter represented that he was interested in buying The Local Car Wash, but indicated that he wanted financial information related to The Local Car Wash. Thus began an extended process of financial due diligence by the plaintiffs. As part of this process on October 30, 2019, Treanor sent an email to Cueter, which contained a year-to-date Profit and Loss Statement for The Local Car Wash for 2019. In this email, Treanor represented that he was confident the gross revenue for 2019 would exceed $400,000. Cueter then requested federal tax returns for The Local Car Wash, and Treanor sent Cueter an email dated December 11, 2019, and attached federal tax

returns for 2017 and 2018. These returns indicated gross sales of $188,691 in 2017, and $365,732 in 2018.

A purchase agreement for The Local Car Wash was ultimately signed by the parties on January 16, 2020. The agreement initially stated: "Local operates a car wash business on the Property commonly known as The Local Car Wash (the 'Business')." (Doc. 48, at 22). The agreement further states: "Seller wishes to sell and Purchaser wishes to purchase the Property, Tangible Personal Property, and Intangible Personal Property on the terms and conditions set forth herein." (Id.) The Property was listed as "certain real property located in Chambersburg, PA commonly known as 331 West Loudon St., Chambersburg, PA 17201." (Id.) The Tangible Personal Property set forth in Schedule "1" included "[a]ll furniture, fixtures, equipment, tools, office equipment, computers, hardware, signs, locks, keys, telephones, and other tangible personal property used in connection with the Business. . ." (Id., at 34). The Intangible Personal Property "used in connection with the Business" set forth in Schedule "2" included "all social media accounts, email addresses used in connection with the business, software programs . . . the website and domain addresses [for The Local Car Wash]. . . the tradename The Local Car

Wash . . . all goodwill, all passwords, [and] all records and books related to the Business." (Id., at 35).

The agreement set forth the purchase price for the Property, Tangible Personal Property, and Intangible Personal Property as $1,200,000. (Id., at 23). Section 12 of the agreement provided for representation and warranties. Specifically, Section 12(m) provided that "[a]ll financial information provided to Purchaser in connection with this Agreement is true and accurate, and all financial information to be provided to Purchaser before or during the Feasibility Period or thereafter shall be true and accurate." (Id., at 29-30). Additionally, Section 19 of the agreement contained a non-competition clause, wherein the sellers agreed that they would not own or operate "a business which competes with the current business being operated at the Property. . . . For the avoidance of doubt, the 'current business being operated at the Property' consists of the ownership, leasing, managing, and general operation of a car wash business." (Id., at 32).

After the purchase agreement was signed, and during the extended feasibility period set forth in the agreement to allow for Cueter and Wang to review the financials of the car wash, Cueter emailed Treanor, requested annual bank statements for 2018 and 2019, 2019 statements, and informed Treanor that he wanted to discuss "business diligence." Treanor provided Cueter with the 2019 tax return, as well as the Sales detail reports from the car wash's reporting software, Sonny's

Direct, in February of 2020, but did not provide bank statements, as he claimed he had comingled funds from his other entity, Pipettes Unlimited, and thus, the statements would not be useful.

The gist of the plaintiffs' breach of contract and fraud claims rely upon what are alleged to be undisclosed discrepancies between the reported gross earnings for the car wash and its net income. For example, the 2019 federal tax return provided to the plaintiffs reflected gross sales of $430,110. However, the sales detail report which was also given to the plaintiffs for 2019 showed average sales of $303,513.22. The difference between these gross and net income figures was clearly identified in these financial reports as the result of deducting the "redemptions" for that year. Similarly, the total average sales for 2017 and 2018 in the sales detail reports were less than reported on the 2017 and 2018 tax returns. While the tax returns submitted to the plaintiffs indicated gross sales of $188,691 in 2017 and $365,732 in 2018, the sales detail reports provided to the plaintiffs indicated average sales of $149,400 in 2017 and $287,678.54 in 2018. For their part, the defendants contend that they included the redemptions in the total sales when reporting gross sales on their tax returns because they did not want to underreport income on these tax returns. The plaintiffs, in turn, contend that Treanor orally represented to them that they could

ignore the redemptions and just include them in gross income as it was on the tax returns.

However, what is undisputed is that this discrepancy, and its root causes, were identified in the financial statements and tax returns provided to the plaintiffs in the course of their due diligence inquiry. The discrepancy was revealed through a comparison of gross earnings reported on income tax returns, and the actual sales data provided by Treanor to the plaintiffs. The discrepancy would also have been apparent due to an issue identified by the plaintiffs during their due diligence examination—the need for Treanor to pay state sales taxes on past sales. These sales tax returns and payments, which were undertaken by the defendant at the plaintiffs' insistence, also highlighted a disparity between gross earnings and net income.

Additionally, it is also clear that the plaintiffs sought, and received, ample time in which to conduct this due diligence inquiry. The feasibility study period was initially set to expire in March of 2020 to allow the plaintiffs time to gather more information about The Local Car Wash. This feasibility period was then extended through April of 2020, May of 2020, and ultimately through mid-October of 2020. These extensions were, in part, due to the COVID-19 pandemic, during which the plaintiffs represented to Treanor that the bank wanted to see that the business was holding up before approving the plaintiffs' loan. Yet while the plaintiffs represented that these delays were a product of the bank's reluctance to finance this purchase, it

appears that the plaintiffs may have already secured financing for the purchase of the car wash at the time they represented to Treanor that the bank was holding up the loan. Ultimately, the parties closed on the agreement on December 18, 2020. At the time of closing, the defendants executed a Bring Down Certificate, further warranting that the representations and warranties in the purchase agreement, including the warranties regarding the accuracy of financial information provided, were true and correct.

The following day, on December 19, 2020, the plaintiffs abruptly demanded to rescind the deal with the defendants. According to the plaintiffs, it was only after they gained access to the Sonny's system after the closing that they learned of The Local Car Wash's actual revenue.  Upon this realization, the plaintiffs moved to rescind the agreement, but the defendants refused. The instant suit was filed shortly thereafter on December 23, 2020.

The complaint was initially filed in state court in Virginia, and the defendants removed the case to federal court in the Eastern District of Virginia. (Doc. 1). The parties then jointly moved for the case to be transferred to the Middle District of Pennsylvania. (Docs. 4, 5). The plaintiffs filed an amended complaint on October 12, 2021, which is the operative pleading in this case. (Doc. 48).

In their amended complaint, the plaintiffs assert claims of breach of contract (Count I); fraud in the inducement (Count II); actual/constructive fraud (Negligent

Misrepresentation) (Count III); business conspiracy (Count IV); piercing the corporate veil (Count V); and for recission of promissory note (Count VI). The amended complaint requests recission of the contract, monetary damages, recission of the promissory note, and attorney's fees.

Following discovery, the parties then filed their respective motions for summary judgment (Doc. 77, 78). In their motion, the plaintiffs argue that there is no factual issue as to the breach of contract claim because the defendants provided them inaccurate financial information in breach of the representations and warranties set forth in the purchase agreement. Specifically, the plaintiffs contend that they relied on the gross income reported on the federal tax returns to estimate the cash flow of the business, which they allege they relied on in agreeing to the purchase price of $1,200,000. Thus, they argue that because the income reported on the tax returns overstated the amount of actual income, they were provided with inaccurate information in breach of the agreement.

For their part, the defendants contend that they are entitled to summary judgment on this claim and the remainder of the plaintiffs' claims. On this score, the defendants argue that they did not provide inaccurate financial information, as the plaintiffs were provided with both the federal tax returns and the sales detail reports from Sonny's, which reflected the net income after deducting the redemptions. Accordingly, the defendants assert that the plaintiffs had this information available

to them prior to closing on the agreement, and this information was not inaccurate in violation of the warranties in the purchase agreement. Moreover, the defendants argue that the plaintiffs' fraud claims and business conspiracy claims fail as a matter of law. Further, the defendants assert a counterclaim, arguing that the plaintiffs breached the promissory note and escrow agreement.

After consideration, we conclude that the plaintiffs have not set forth evidence showing a genuine dispute of material fact with respect to their claims. We further find that the defendants are entitled to summary judgment on their counterclaim for breach of the promissory note and escrow agreement. Accordingly, the plaintiffs' motion for partial summary judgment will be denied, and the defendants' motion for summary judgment will be granted.

## III.   Discussion

### A. Motion for Summary Judgment – Standard of Review

The parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co.

v. Dentsply Int'l, Inc., 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla

of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark New Jersey v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon

bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338,

341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or

assess credibility when passing upon a motion for summary judgment. Rather, in

adjudicating the motion, the court must view the evidence presented in the light most

favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable

inferences in the light most favorable to the non-moving party. <u>Big Apple BMW,</u>

<u>Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where

the non-moving party's evidence contradicts the movant's, then the non-movant's

must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the

evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see</u>

<u>also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third

Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not
> match, item for item, each piece of evidence proffered by the movant.
> In practical terms, if the opponent has exceeded the "mere scintilla"
> threshold and has offered a genuine issue of material fact, then the court
> cannot credit the movant's version of events against the opponent, even
> if the quantity of the movant's evidence far outweighs that of its
> opponent. It thus remains the province of the fact finder to ascertain the
> believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

In this case, we are presented with cross motions for summary judgment. In this setting:

> "When confronted with cross-motions for summary judgment ... 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.' " Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F.Supp.2d 425, 430 (M.D. Pa. 2006) (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 Fed.Appx. 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id. (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

Pellicano v. Office of Pers. Mgmt., Ins. Operations, 8 F. Supp. 3d 618, 625–26 (M.D. Pa. 2014), aff'd sub nom. Pellicano v. Office of Pers. Mgmt., 714 F. App'x 162 (3d Cir. 2017).

## B. **The Plaintiffs' Motion for Summary Judgment will be Denied, and the Defendants' Motion for Summary Judgment will be Granted.**

As we have noted, the plaintiffs have moved for summary judgment on Count I of the complaint, which alleges that the defendants breached the Purchase Agreement. For their part, the defendants have moved for summary judgment,

contending that all of the plaintiff's claims fail as a matter of law and asserting a counterclaim for breach of the promissory note and escrow agreement. As explained in more detail below, we find that the defendants are entitled to summary judgment on the plaintiffs' claims and on their counterclaim for breach of the promissory note and escrow agreement. We will address each of these claims in turn.[2]

### 1.  **Breach of Contract (Count I)**

Count I of the plaintiffs' complaint alleges that the defendants breached the Purchase Agreement when they provided the plaintiffs with misrepresentations or inaccurate statements concerning the car wash's gross revenue. The plaintiffs contend that Section 12(m) of the Purchase Agreement warranted that all financial documents provided by the seller were true and accurate, and thus, the defendants breached this provision when they provided tax returns that reflected an inflated gross revenue. For their part, the defendants argue that the plaintiffs were provided,

---

[2] The Purchase Agreement provides: "This Agreement shall be construed in accordance with the laws of the Commonwealth of Virginia." (Doc. 48, at 32). Moreover, this case was transferred from the Eastern District of Virginia pursuant to a joint transfer request under 28 U.S.C. § 1404(a). (Docs. 4, 6). Thus, to the extent the parties disagree as to the law that applies here (See Doc. 91, at 48-51; Doc. 94, at 12-13), it is well settled that where "a civil case has been transferred from one district to another pursuant to 1404(a), the transferee court applies the law of the transferor state, including its choice of law rules, as if there had been no change of venue." Stokes v. Markel American Ins. Co., --F.Supp.3d--, 2022 WL 980587, at *4 (M.D. Pa. 2022) (citing Van Dusen v. Barrack, 376 U.S. 612, 639 (1964)). Accordingly, our analysis of the plaintiffs' claims will be guided by the laws of Virginia.

not only with the tax returns, but with the Sonny's sales detail reports, which indicated that the net income of the car wash was lower than the gross revenue after the redemptions were deducted from gross revenue. Thus, the defendants contend that they did not breach the agreement because they did not misrepresent or supply the plaintiffs with inaccurate or untrue information.

Under Virginia law, in order to prevail on a breach of contract claim, the plaintiffs must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach o[f] obligation." Hanback v. DRHI, Inc., 94 F.Supp.3d 753, 761 (E.D. Va. 2015) (citing Filak v. George, 594 S.E.2d 610, 614 (Va. 2004)). Further, a plaintiff must show that the breach was material, in that the breach was "a failure to comply with a fundamental aspect of the contract, so that the failure to perform the obligation defeats an essential purpose of the contract." Vienna Metro LLC v. Pulte Home Corp., 786 F.Supp.2d 1076, 1081 (E.D. Va. 2011) (citing Horton v. Horton 487 S.E.2d 200, 204 (Va. 1997)).

Here, the plaintiffs base their breach of contract claim on the representations and warranties section of the Purchase Agreement, which states: "to the best of the Sellers' knowledge: [a]ll financial information provided to Purchaser in connection with this Agreement is true and accurate, and all financial information to be provided to Purchaser before or during the Feasibility Period or thereafter shall be true and

accurate." (Doc. 48, at 29-30). The plaintiffs assert that because the tax returns provided by Treanor reflected inflated gross revenue, the defendants did not provide true and inaccurate financial documents to the plaintiffs. TFB further assert that this is a material breach because they relied on the gross revenue figures in the tax returns to calculate cash flow of The Local Car Wash.

However, the record is clear that the tax returns were not the only financial records provided to the plaintiffs during the Feasibility Period. Indeed, Treanor also provided the plaintiffs with the Sonny's sales detail reports, which reflect net incomes lower than the gross revenue indicated on the tax returns. On this score, as we have noted, the 2019 federal tax return reflected gross sales of $430,110, while the sales detail report for 2019 showed average sales of $303,513.22, which was the result of deducting the "redemptions" for that year. Similarly, the 2017 and 2018 tax returns indicated gross sales of $188,691 in 2017 and $365,732 in 2018, while the sales detail reports indicated average sales of $149,400 in 2017 and $287,678.54 in 2018. The plaintiffs do not dispute that they received this information and, in fact, appear to have gone over the Sonny's reports in detail with Treanor at a site visit sometime in February of 2020. (Doc. 88, at 202). At this visit, the plaintiffs represent that Treanor told them redemptions were included in the gross revenue, which appears to be consistent with an email from Carmisha Dean from Sonny's to

Treanor, which stated: "Redemptions revenue is counted in Gross and then reduced out to reach Net Sales." (Id., at 474).

Accordingly, we cannot conclude that the defendants breached the Purchase Agreement. The Purchase Agreement warranted that the financial information given by the defendants would be true and accurate to the best of their knowledge. Here, the record shows that Treanor provided financial records for The Local Car Wash, including both the federal tax returns and Sonny's reports. Treanor indicated to the plaintiffs, after speaking with someone from Sonny's, that redemptions were included in gross revenue, which is why the gross income number on the federal tax returns was higher than the net income number on the Sonny's reports.

Facts are stubborn things, and in this case a series of stubborn facts defeat the plaintiffs' breach of contract claim. First, there seems to be no factual dispute that the federal tax returns and sales reports provided by Treanor were true and correct copies of these financial documents. Accoridngly, there can be no claim that these records were altered and thus violated the contract's disclosure provisions. Moreover, an examination of these records would have readily disclosed the discrepancy between gross and net sales which the plaintiffs now belatedly claim was concealed from them. Therefore, the plaintiffs' contractual non-disclosure claim rests upon allegedly "concealed" information that was, in fact, hiding in plain view in the financial reports provided to these sophisticated investors during their due

diligence inquiry.  In our view, the mere fact that the plaintiffs elected to use the gross income number in the federal tax returns to conduct a cash flow analysis of the car wash business does not equate to a material breach of the Purchase Agreement's warranties that accurate financial information would be provided. Accordingly, we will grant summary judgment in favor of the defendants on the plaintiff's breach of contract claim.

### 2.  **Conspiracy (Count IV)**

The plaintiffs also assert a claim of business conspiracy against the defendants, alleging that the defendants conspired among themselves, as well as with several unnamed coconspirators, to defraud the plaintiffs by providing them with misleading financial information and blocking access to information that would have revealed the financial standing of the business. However, as we will discuss below, we conclude that the plaintiffs' conspiracy claim fails as a matter of flaw and will be dismissed.

In order to make a claim for business conspiracy, the plaintiffs must show "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring a plaintiff's business, and (2) resulting damages to the plaintiff." Rosenthal v. R.W. Smith Co., 260 F.Supp.3d 588, 593 (W.D. Va. 2017) (quoting Rogers v. Deane, 992 F.Supp.2d 621, 633 (E.D. Va.), aff'd 594 F. App'x 768 (4th Cir. 2014)) (quotations omitted); see also Va. Code. Ann. § 18.2-499. A plaintiff does not have

to prove that the defendants acted with actual malice, but rather that the defendants "acted with legal malice, *i.e.*, 'intentionally, purposely, and without lawful justification.'" Dunlap v. Cottman Transmission Systems, LLC, 754 S.E.2d 313, 317 (Va. 2014) (quoting Commercial Bus Systems, Inc. v. BellSouth Services, 453 S.E.2d 261, 267 (Va. 1995)). Importantly, however, "there cannot be a conspiracy between agents of a corporation operating within the scope of their duties," Rosenthal, 260 F.Supp.2d at 594, and "a corporation, like an individual, cannot conspire with itself." Bowman v. State Bank of Keysville, 331 S.E.2d 797, 801 (Va. 1985). Thus, "when agents are acting within the scope of their duties, there is only one entity acting—the principal itself." Rosenthal, 260 F.Supp.2d at 594.

On this score, as the defendants correctly point out, Treanor and his entities could not conspire among themselves because Treanor is the owner and agent of those entities. Thus, to the extent that the plaintiffs argue that they have made a showing of a business conspiracy among the named defendants, such a conspiracy is legally impossible. Moreover, the claim that these defendants conspired with an unnamed coconspirator—namely, Jack Sharpe, the escrow agent involved in the closing—fails as well, as there is no evidence of an agreement between Treanor and Sharpe to defraud the plaintiffs or prevent them from gaining access to relevant information. The plaintiffs point to the deposition of Cueter, arguing that the record is replete with evidence of a conspiracy. However, Cueter simply states in his

deposition that he believes Sharpe did not fulfill his fiduciary duties to the plaintiffs as the escrow agent involved in the deal, and that Sharpe informed the plaintiffs prior to the closing that it would take 45 days to submit the sales and use tax documents. (Doc. 88, at 238-39).

Simply put, there is no evidence in the record of an agreement or understanding between Treanor and Sharpe to provide the plaintiffs with misleading financial information or prohibit them from receiving other financial information. Additionally, as we have explained, it is a legal impossibility for Treanor, the owner of Treanor Properties, LCC and The Local Car Wash, Inc., to conspire with his own entities. Accordingly, this business conspiracy claim fails as a matter of law and will be dismissed.

### 3. **Fraud (Counts II and III)**

The TFB plaintiffs further allege that the defendants fraudulently induced them to enter the Purchase Agreement and to continue with the closing by providing them materially misleading financial information, such as the federal tax returns. On this score, the plaintiffs assert that Treanor orally represented to them that the car wash business was performing better than it actually was so that the sale of the car wash would go through. For their part, the defendants first contend that any alleged misrepresentation made by Treanor were not material because the plaintiffs purchased the property, not the business. They further assert that any reliance on the

alleged misrepresentations was not reasonable, as the individuals purchasing the property were experienced businessmen and had all of the relevant financial documents prior to the closing. After consideration, we find that the plaintiffs have not set forth evidence to show a genuine issue of material fact with respect to the fraud claims. Accordingly, we will grant summary judgment in favor of the defendants.

A claim for actual fraud requires a showing by clear and convincing evidence of "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damages to the party misled." Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999) (quoting Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994)) (quotations omitted). A plaintiff may alternatively prove constructive fraud[3] by showing that the representation was made not with the intent to mislead, "but [wa]s made innocently or negligently." Id. (citing

---

[3] We note that the plaintiffs bring claims for both fraud in the inducement/ negligent misrepresentation (Count II) and constructive fraud (Count III). On this score, Virginia law treats constructive fraud and negligent misrepresentation as a single claim. See Schmidt v. Wells Fargo Home Mortgage, 2011 WL 1597658, at *6 n.2 (E.D. Va. April 26, 2011) ("The Plaintiffs' 'fraudulent inducement,' 'fraudulent misrepresentation,' and 'negligent misrepresentation' claims may not be causes of action different from the actual and constructive fraud claims alleged"); Richmond Metro Authority v. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 347 (Va. 1998) ("The essence of constructive fraud is negligent misrepresentation"). Accordingly, we will analyze the plaintiffs' fraud claims as claims for actual and constructive fraud.

Bradley v. Tolson, 85 S.E. 466, 467 (Va. 1915)). Under Virginia law, an omission or concealment of a material fact may constitute fraud if the individual knew that "the other party is acting upon the assumption that the fact does not exist," Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 597 (Va. 1984), and deliberately fails to disclose the fact "to prevent another from learning the truth." Hitachi, 166 F.3d at 629 (citing Van Deusen v. Snead, 441 S.E.2d 207, 209 (Va. 1994)).

Regarding the plaintiff's showing of reliance, "a plaintiff must demonstrate that its reliance upon the representation was reasonable and justified." Meridian Title Ins. Co. v. Lilly Homes, Inc., 735 F.Supp. 182, 185 (E.D. Va. 1990). On this score, "[t]he touchstone of reasonableness is prudent investigation. A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with fully opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry." Hitachi, 166 F.3d at 629. As one Virginia court has aptly explained:

> [I]f false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him, the law, in general, will leave him where he has been placed by his own imprudent confidence.

Id. (quoting Horner v. Ahern, 153 S.E.2d 216, 219 (Va.1967)) (internal quotations and citations omitted). However, where a seller does or says something which diverts

the buyer from making an appropriate inquiry or investigation, a buyer may recover for fraud. Id. (citing Horner, 153 S.E.2d at 319).

In the instant case, we find that there are no genuine disputes of material fact regarding the plaintiffs' claims for actual or constructive fraud. The plaintiffs assert that Treanor orally represented to them that the redemptions were to be included in gross income, but that he did not relay the information from Sonny's that redemptions were to be excluded to reach the net income. The plaintiffs contend that Treanor purposely misrepresented this fact to them in order to make it appear that The Local Car Wash was doing well from a business standpoint. Alternatively, they assert that Treanor himself misunderstood the redemptions and how they factored into gross and net income, but in any event, told the plaintiffs to ignore the redemptions and to go by the gross income on the tax returns. The plaintiffs further contend that Treanor withheld passwords and bank statements from them, and that TFB did not gain access to the POS system until the date of the closing in December of 2020. Ultimately, the plaintiffs claim that they relied to their detriment on Treanor's misrepresentations because the misrepresentations caused them to miscalculate the cash flow of the business. They assert these misrepresentations were material because they were basing the $1,200,000 purchase price on their estimated cash flow of the business, and given that those numbers were misrepresented and inaccurate, they did not receive the benefit of the bargain.

For his part, Treanor asserts he did not misrepresent anything relating to the redemptions. Treanor claims that he was told by Sonny's to include redemptions in gross income for tax purposes, and so that is what he told the plaintiffs. However, Treanor admitted in his deposition that he did not really understand how the redemptions worked. (Doc. 88, at 100). He also conceded that he did not give the plaintiffs the passwords for the POS system until the closing, although he stated that the plaintiffs never asked him for access to the POS system. (Id., at 59). Additionally, the defendants claim that any alleged misrepresentation was not material, because the plaintiffs were purchasing the property, not the car wash business, from Treanor. Moreover, they assert that reliance on any such representation was not reasonable or justified, as the individuals who purchased the car wash were experienced entrepreneurs and had all of the car wash's financials, including the Sonny's reports indicating the net income of the car wash, at their disposal prior to the final closing.

On this score, we conclude that the plaintiffs have not set forth evidence to raise a genuine dispute of material fact with respect to the fraud claims. As we will discuss below, even if we concluded that Treanor made misrepresentations, we cannot conclude that the plaintiffs reasonably and justifiably relied on those representations.

Quite the contrary, we conclude that the plaintiffs have not shown that any reliance on any material misrepresentations made by Treanor was reasonable and

justifiable. As the defendants point out, the individuals who purchased the car wash through the TFB plaintiffs were experienced businessmen. Both Mr. Cueter and Mr. Wang had graduated from one of the country's top business schools, Mr. Cueter was employed as a financial analyst for various private investment firms, and Mr. Wang also had experience performing financial due diligence and reviewing financial documents. (Doc. 88, ¶¶ 22-24, 28-30). For his part, Mr. Treanor was a high school graduate, and conceded that he "didn't really have a good understanding of running a car wash." (Id., at 100). According to Mr. Cueter, he and Mr. Wang had done extensive research in 2019 into car wash businesses prior to reaching out to Mr. Treanor about buying The Local Car Wash. (Id., at 175).

Mr. Cueter testified that they encountered a few issues during their review of the business' financials which revealed to the plaintiffs that they were more financially sophisticated than Treanor, including "a sales and use issue, which frankly, the seller didn't even understand." (Id., at 230).[4] With respect to the issue of redemptions, Cueter stated that Treanor told them to ignore the redemptions and include them in revenue, and that Cueter relied on Treanor's word because of the

---

[4] We note that when the evidentiary relevance of this admission regarding his greater degree of financial sophistication became apparent, Cueter attempted to unilaterally "strike" his prior sworn testimony that he had uncovered financial issues that the seller did not understand. (Doc. 88, at 101). Counsel conducting the deposition declined to allow him to do so. Likewise, we cannot allow Cueter's buyer's remorse at having made this admission create a material issue of fact in this case.

warranties and representations section of the Purchase Agreement. (Id., at 203). However, it is undisputed that Cueter and Wang had the Sonny's sales detail reports, which they claim to have gone over in extensive detail, and which report redemptions as a negative number reduced out to reach net income. In fact, Cueter stated that "we were able to sit down with [Treanor] face-to-face and we had the reports and the tax returns with us, and we were able to go through the reports side by side with the 2019 tax return." (Id., at 177). Thus, it strains credulity that two experienced businessmen, who had done extensive research into the business of running a car wash and who had experience as financial analysts, simply took Treanor at his word when he told them to disregard the redemptions.

In our view, this reliance claims founders on at least two obstacles. First, as a matter of general business economics it is inconceivable that two sophisticated business investors, who had studied this particular industry, would have reasonably relied upon gross earnings alone when conducting their profitability analysis. Even a neophyte investor would have understood that net profits were a better fiscal benchmark of business cash flow than gross earnings.[5]

---

[5] We are also constrained to observe on this score that during his deposition, Mr. Cueter, who attested to his education, experience and sophistication as an entrepreneur and business investor, at one point seemed to claim that he "didn't know what gross [income] is." (Doc. 88, at 200). This testimonial assertion was incredible and further undermines any reasonable reliance claim.

The plaintiffs' reasonable reliance claim further fails when examined in light of the undisputed evidence. That evidence reveals that the discrepancy between gross sales and net income which the plaintiffs belatedly claim was hidden from them was, in fact, disclosed throughout the financial reports that they received and claimed to have carefully reviewed during their extensive due diligence inquiry. Further, the plaintiffs' assertions that in the face of this objective evidence identifying this disparity between gross and net income they blindly followed Treanor's fiscal guidance cannot be credited  considering that Cueter and Wang had discussed other discrepancies in the car wash's financials with Treanor, including the fact that Treanor did not know he had to pay sales and use tax in Pennsylvania. Indeed, as we have noted, Cueter stated that he did not think Treanor understood the issue of the sales and use tax. Thus, the plaintiffs would have us embrace the view that these sophisticated investors reasonably relied upon someone who they concluded did not fully understand his own business finances when they engaged in a profitability analysis that failed to consider all of the objective economic data provided to them. This we cannot do.

The instant case is similar to White v. Potocska, 589 F.Supp.2d 631 (E.D. Va. 2008). In that case, the defendants asserted a counterclaim of fraud against the plaintiff and other counterclaim defendants arising out of the sale of a business. Id. at 639. This gist of the fraud claim was the failure of the counterclaim defendants to

disclose accurate information relating to the sale. Id. at 645-46. The court ultimately granted summary judgment in favor of the counterclaim defendants, finding that the counterclaim plaintiffs had not shown that they reasonably relied on the defendants' alleged misrepresentations. Id. at 646-47. Notably, the court recognized that the counterclaim plaintiff made his own investigation into the matter, and thus, he was not entitled to rely on the representations of another. Id. at 646. On this score, the court reasoned:

> Potocska chose the method of due diligence—namely, utilize the computer in part, and have Gunbeyi provide him with additional information at his request. Potocska undertook an investigation into WIP prepayments and found many of them. There is nothing in the record to suggest he could not have found all of the alleged prepayments had he continued his due diligence. While it may be true that due diligence does not require a prospective purchaser to go through every piece of paper, prospective purchasers make a choice of how much information to review. The law in Virginia is that a prospective purchaser who undertakes due diligence is charged with knowledge of everything that he could have learned by going through every piece of paper that was available to him. Harris, 203 Va. at 767, 127 S.E.2d 65. The record suggests that Potocska focused his due diligence on finding prepayments. The mere fact that he chose to curtail his investigation before he found them all does not suggest fraud on the part of the White Defendants.

Id.

Similarly, in the instant case, Cueter and Wang undertook their own investigation of the car wash's financials. They asked Treanor for financial information related to the car wash, and they received tax returns, profit and loss statements, and the Sonny's sales detail reports. They claim that they went over these

financials in detail, having found some discrepancies that were pointed out to Treanor. While they contend that they were not provided with bank statements and the sales and use tax documents, they proceeded with the purchase of the car wash anyway. As the White court reasoned, "a prudent buyer would realize he is not going to be able to do a full investigation and look for another [business] to purchase, adjust his offer, or accept the risk and go forward with the purchase." Id. at 646-47. Thus, the plaintiffs, having gone through with the purchase of the car wash, cannot now claim that they relied on representations by Treanor while they were conducting their own investigation into the car wash's financials.

In sum, we conclude that no reasonable juror could find that the plaintiffs justifiably and reasonably relied on Treanor's representations to their detriment when purchasing the car wash. Rather, it is clear from the record that the TFB plaintiffs had substantial financial information at their disposal prior to the closing, including the discrepancy between the gross income on the tax returns and the redemptions on the Sonny's reports. While they contend that they never received certain pertinent financial information, or received it just prior to the closing, the plaintiffs chose to move forward with the purchase of the car wash. Accordingly, we conclude that the plaintiffs have not shown that they reasonably and justifiably relied on a material misrepresentation, and we will grant summary judgment in favor of the defendants.

### 4. **Counterclaim**

Finally, the defendants have asserted a counterclaim against the plaintiffs for a breach of the promissory note and escrow agreement. They contend that the TFB plaintiffs have failed to release the funds in escrow to pay sales tax, which has resulted in penalties and interest lodged against the defendants. (Doc. 49-1, at 19-21). They also assert that the plaintiffs have breached the promissory note executed at the closing, which provided that the TFB Midatlantic 4, LLC would pay $100,000 over a period of 8 years in monthly installments. (Doc. 49-1, at 29-33).

TFB does not dispute that it has failed to make any payments under the promissory note, or that it has failed to release the escrow funds for payment of sales taxes. Rather, the TFB plaintiffs only argue that because they sought rescission of the promissory note and the Purchase Agreement, the defendants' counterclaim is not ripe. Therefore, the lynchpin of the plaintiffs' defense to this counterclaim is their assertions regarding the merits of their own claims.

However, we have determined that the plaintiffs' claims for breach of contract, conspiracy, and fraud fail as a matter of law. Accordingly, given that it is undisputed the plaintiffs have not paid any money pursuant to the promissory note and have not released the escrow funds, we will grant summary judgment in favor of the defendants on this counterclaim. Given that the amount of damages due to the defendants is disputed, we will direct the parties to consult and confer on the issue

of damages, and prepare a joint case management plan for the court regarding how the parties prefer to move forward on the issue of damages with respect to these counterclaims—namely, whether the parties wish to prepare supplemental briefs, have an evidentiary hearing, or to proceed with a trial on the issue of damages.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the plaintiffs' motion for partial summary judgment (Doc. 78) will be DENIED, and the defendants' motion for summary judgment (Doc. 77) will be GRANTED. The parties shall prepare a joint case management plan regarding how the parties prefer to move forward on the issue of damages on the defendants' counterclaims.

An appropriate order follows.

<u>*S/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: October 6, 2022